**LONG ISLAND AMBULANCE, INC., Daniel J. Roberts and Jeffrey M. Roberts as Assignees of Interest, Plaintiffs,**

v.

**Tommy G. THOMPSON, Secretary of the United States Department of Health and Human Services, Defendant.**

**No. 01 CV 2083(ADS)(WDW).**

United States District Court, E.D. New York.

Sept. 12, 2002.

Jeffrey M. Roberts, Esq., Hauppauge, NY, Plaintiff Pro se and Attorney for Plaintiff Long Island Ambulance, Inc.

Daniel J. Roberts, Henderson, NV, Plaintiff Pro Se.

Roslynn R. Mauskopf, United States Attorney Eastern District of New York, By Gail A. Matthews, Assistant United States Attorney, Central Islip, NY, Attorney for Defendant Tommy G. Thompson, Secretary of the United States Department of Health and Human Services.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On April 3, 2001, Daniel J. Roberts ("Daniel Roberts"), Jeffrey M. Roberts ("Jeffrey Roberts") (collectively, the "Roberts" or the "individual plaintiffs"), and Long Island Ambulance, Inc. ("LIA") (collectively, the "plaintiffs") commenced this action by filing a complaint alleging that Tommy G. Thompson, Secretary of the United States Department of Health and

Human Services ("HHS" or the "defendant") deprived them of their constitutional right to due process by failing to afford them an opportunity to challenge the decision by HHS to suspend Medicare payments to LIA. The plaintiffs seek a writ of mandamus directing HHS to: (1) commence a criminal and/or civil action against LIA; or (2) pay the plaintiffs the sum of $545,702.23, which sum represents the suspended Medicare payments. Presently before the Court is a motion by HHS to dismiss the complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") for lack of subject matter jurisdiction.

## I. BACKGROUND

Initially, the Court notes that when deciding a motion to dismiss for lack of subject matter jurisdiction, it "must accept as true all material factual allegations in the complaint." *Shipping Financial Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998). In addition, the Court may consider materials outside the pleadings, such as affidavits and testimony, to resolve disputed jurisdictional fact issues. *See Robinson v. Government of Malaysia*, 269 F.3d 133, 141–42 (2d Cir.2001); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). Accordingly, the following factual allegations are taken from the complaint and the exhibits attached to it; the Declaration of Jean Stone, who is the Program Integrity Senior Specialist for the Centers for Medicare and Medicaid, submitted in support of HHS's motion to dismiss the complaint; the exhibits attached to Jean Stone's declaration; and the Medicare statute and regulations.

### A. Statutory and Regulatory Framework

Medicare, the federal medical insurance program for the aged and disabled, is governed by Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. §§ 1395–1395gg.

The Centers for Medicare & Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"), *see* 66 Fed.Reg. 35437 (July 5, 2001), is responsible for administering the Medicare Program. Part A of the Medicare Program ("Hospital Insurance Benefits") authorizes payment for primary institutional care, including hospitals, skilled nursing facilities, and home health care. *See* 42 U.S.C. § 1395c, *et. seq.* Part B of the Medicare Program ("Supplementary Medical Insurance") authorizes payment for various medical and other health services and supplies, including outpatient services. *See* 42 U.S.C. § 1395j, *et. seq.* This case involves Part B of the Medicare Program because the services at issue are outpatient ambulance services provided to non-hospitalized beneficiaries.

HHS contracts with private insurance carriers to perform various functions necessary for the efficient administration of Part B of the Medicare Program. *See* 42 U.S.C. § 1395u. These functions include determining whether claimed services are medically necessary, calculating the amounts of any Part B payments due, and paying claims out of the Medicare Trust Funds. *See* 42 U.S.C. § 1395u(a)(1); 42 C.F.R. Part 405, Subpart E; 42 C.F.R. Part 414; 42 C.F.R. §§ 421.5, 421.200. Empire Medicare Services ("Empire") is the carrier responsible for processing and paying the Part B claims at issue in this case.

Medicare Part B reimburses a supplier for ambulance services if the following conditions are met: (1) the supplier meets applicable vehicle, staff, billing, and reporting requirements; (2) the services meet the medical necessity, origin, and destination requirements set forth in the regulations; and (3) Medicare Part A payments are not made directly or indirectly for the services. 42 C.F.R. § 410.40. The vehicle

requirements provide, among other things, that an ambulance "comply with all State and local laws governing an emergency transportation vehicle." 42 C.F.R. § 410.41(a)(1). During the time period relevant to this case, New York state law required an ambulance service to possess a valid ambulance certificate or registration statement. *See* N.Y. Pub. Health L. § 3005. In addition, ambulance certificates are not transferable unless the transfer is reviewed and approved by the New York State Department of Health ("DOH"). *See* N.Y. Pub. Health L. § 3010(2). The billing and reporting requirements that an ambulance services supplier must meet in order to receive Medicare reimbursement mandate that, upon a carrier's request, the supplier must "provide the Medicare carrier with documentation of compliance with emergency vehicle and staff licensure and certification requirements in accordance with State and local laws." 42 C.F.R. § 410.42(c)(2).

Medicare regulations authorize the suspension of payments to a provider such as LIA when "the intermediary, or the carrier possesses reliable information that an overpayment or fraud or willful misrepresentation exists." 42 C.F.R. § 405.371(a)(1). A "suspension" is a "withholding of payment by an intermediary or carrier of an approved Medicare payment amount." 42 C.F.R. § 405.370. The preamble to the regulations states, "[t]he purpose of suspending payment is to verify whether, and how much, payment was actually due the provider for past claims and to ensure that, if a provider or supplier was overpaid, sufficient funds are available to recover the overpayment. These actions are clearly necessary to protect the Trust Funds from loss." 61 Fed.Reg. at 63742–63743. A suspension is limited to 180 days. 42 C.F.R. 405.372(d)(1). CMS may extend the suspension of payment for up to an additional 180 days in cases of fraud and misrepresentation where the

carrier, the Office of the Inspector General ("OIG"), or law enforcement agency is unable to complete its examination of the information or investigation. 42 C.F.R. § 405.372(d)(2). In certain circumstances, CMS may grant an additional extension of time "if the Department of Justice submits a written request to CMS that the suspension of payment be continued based on the ongoing investigation and anticipated filing of criminal and/or civil actions." 42 C.F.R. § 405.372(d)(3)(ii).

If the intended suspension of payments involves fraud or misrepresentation, prior notice of an intent to suspend payments is not required. *See* 42 C.F.R. § 405.372(a)(4). However, if "a suspension of payment is put into effect without prior notice ... the ... carrier must, once the suspension is in effect, give the provider or supplier an opportunity to submit a rebuttal statement as to why the suspension should be removed." 42 C.F.R. §§ 405.372(a)(2), 405.374. If the provider rebuts the suspension, CMS or the carrier must, within 15 days from the date of the rebuttal statement, consider its contents together with any other material bearing on the case, and determine whether the facts justify the suspension. 42 C.F.R. § 405.375(a). The carrier then must send written notice of its determination to the provider. 42 C.F.R. § 405.375(b). A determination that a suspension of Medicare payments is justified is not an initial determination and is not appealable. 42 C.F.R. § 405.375(c).

After a suspension has taken effect, the carrier or CMS must act in a timely manner to obtain the additional evidence it needs to determine whether an overpayment exists. 42 C.F.R. § 405.372(c). As soon as the carrier or CMS makes a determination, the carrier must inform the provider of the decision, rescind the suspension if appropriate, and dispose of the

suspended funds in accordance with the determination. 42 C.F.R. § 405.372(c). Suspended payments are first applied to reduce or eliminate any overpayments determined by the intermediary, carrier, or [CMS] ... and then applied to reduce any other obligation to CMS or to HHS. In the absence of a legal requirement that the excess be paid to another entity, the excess is released to the provider or supplier. 42 C.F.R. § 405.372(e).

## B. LIA Purchases Gosline Ambulance Service, Inc.

The Roberts are the sole shareholders of LIA, which the complaint alleges is a corporation authorized to provide ambulance services in New York. On August 29, 1996, LIA entered into an agreement to purchase the assets of Gosline Ambulance Service, Inc. ("Gosline") from three individuals who are not parties to this lawsuit. The asset purchase agreement states that the sale would close on or about November 15, 1996.

In papers dated November 8, 1996, LIA submitted an application to Empire for enrollment in the Medicare program so that it could be reimbursed for ambulance transportation services provided to Medicare beneficiaries. The application did not mention that LIA had agreed to acquire Gosline on or about November 15, 1996. The Medicare Enrollment Application requires ambulance supplier applicants to attach a copy of a valid operating ambulance service certificate issued by the relevant state's DOH. LIA attached a copy of an ambulance services certificate, Certificate No. 5006, which was issued by the DOH to LIA on November 1, 1996.

Meanwhile, on November 6, 1996, the Nassau Regional Emergency Medical Services Council approved the transfer of ownership of Gosline to LIA. On November 12, 1996, the Suffolk Regional Emergency Medical Services Council approved the application of LIA to purchase Gosline. In a letter dated December 5, 1996, the Roberts informed the DOH that LIA had purchased Gosline. The DOH approved the transfer of operating authority from Gosline to LIA in a letter dated December 5, 1996, addressed to Daniel Roberts. The DOH advised Daniel Roberts that upon receipt of LIA's new application for emergency medical service agency operating authority, the DOH would issue a new ambulance service certificate. On January 9, 1997, the DOH issued a new operating ambulance service certificate, Certificate No. 5477, which LIA submitted to Empire that same day.

## C. The Medicare Overpayment to Gosline

On January 28, 1997, Empire issued a provider number to LIA and informed it that the provider number was effective January 1, 1997. However, the Roberts allegedly continued to submit claims under Gosline's name and provider number for services performed by LIA. In mid-April 1997, the DOH informed CMS that LIA had acquired Gosline. CMS discovered that Empire had continued to pay claims submitted under Gosline's provider number, despite the fact that Gosline's ambulance services operating authority had been transferred to LIA on or about December 5, 1996.

On May 22, 1997, a representative from Empire sent a memorandum to the DOH requesting information regarding the ownership and ambulance operating authority of LIA and Gosline. In a letter dated June 11, 1997, the DOH confirmed that it had approved the transfer of Gosline's assets and emergency medical service operating authority to LIA, and that as of December 5, 1996, Gosline "was no longer authorized under the provisions of the

NYS Public Health law to provide ambulance service."

In a letter dated June 23, 1997 addressed to Gosline, Empire informed Gosline that it had learned that as of December 5, 1996, Gosline was no longer authorized to provide ambulance services. Empire further advised Gosline that claims submitted for services performed on or after December 5, 1996 would be denied. In a letter to Gosline dated August 4, 1997, Empire wrote the following:

> In our letter of June 23, 1997, we ... indicated ... that claims submitted for services performed on or after December 5, 1996 would be denied.
>
> Our records indicate, however, that a large number of claims for ambulance service provided by Gosline Ambulance Service on or subsequent to December 5, 1996 has already been paid. As a result, Gosline Ambulance Service has received overpayments in the amount of $572,150.79.

Empire's August 4, 1997 letter explains the time and manner in which Gosline must repay the overpayment. Empire also advised Gosline of its right to request a fair hearing.

In a letter dated December 2, 1997, the Roberts requested a fair hearing regarding Empire's August 4, 1997 determination that Gosline had received an overpayment in the amount of $572,150.79. A fair hearing was held on June 25, 1998. On September 30, 1998, the hearing officer issued a decision regarding the overpayment against Gosline. On November 2, 1998, the Medicare Hearing Officer issued an amended decision in which she approved the payments made to Gosline under Gosline's provider number for services rendered from December 5 through December 31, 1996. However, the hearing officer did not approve the payments made to Gosline under Gosline's provider number for services performed after January 1,

1997 because it was "clear" that LIA could have started submitting claims under their own provider number as of January 28, 1997. The Medicare Hearing Officer determined, therefore, that Gosline must refund the money Medicare paid for claims submitted for services performed from January 1 through April 1, 1997. Put differently, the overpayment made to Gosline was the sum of $545.702.23. The Medicare Hearing Officer advised Gosline that it could request a hearing by an Administrative Law Judge ("ALJ") of the Office of Hearings and Appeals of the Social Security Administration.

By letter dated October 27, 1998, Gosline appealed the decision of the Medicare Hearing Officer, and a hearing was scheduled before an ALJ for October 12 and 13, 1999. In a letter dated October 7, 1999, Gosline withdrew its appeal, and in a decision dated November 24, 1999, the ALJ dismissed Gosline's appeal.

In a letter dated November 23, 1998, LIA asked Empire whether, among other things, it should submit claims under its Medicare provider number for the services performed from January 1, 1997 through April 1, 1997 that had previously been billed under Gosline's provider number. Empire responded in a letter dated December 16, 1998, and advised LIA not to "submit claims under its Medicare provider number ... for the services identified in the Gosline Ambulance overpayment letter dated August 4, 1997." However, Empire informed LIA that if it wished to be reimbursed for those services, it must submit to Empire the "Pre-hospital Care Reports" ("PCR") for those services. A PCR is a form that the DOH requires ambulance agencies to complete for each patient transported. The information that must be provided on a PCR includes the name and the DOH-issued identification number of the agency that owns the vehicle trans-

porting the patient. Empire explained that it would review the PCRs to confirm that the appropriate company has rendered and billed for the identified services and would adjust the overpayment accordingly. LIA did not submit the PCRs to attempt to recover money for the services identified in the Gosline overpayment letter.

### D. The Suspension of Payments to LIA

In a letter dated August 4, 1997, the same date as that which appeared on the overpayment letter Empire sent to Gosline, Empire advised LIA that it was suspending Medicare payments to LIA for any future claims submitted "because of reliable evidence that payments you have received, either directly or through other entities that you have acquired or have control of, are the result of fraud or misrepresentation." Empire enclosed a copy of its August 4, 1997 overpayment letter it had mailed to Gosline and explained that the $572,150.79 overpayment occurred during a time when LIA had control of the vehicles and assets of Gosline. Empire also stated that due to the relationship between Gosline and LIA during the period in which the overpayment was made, LIA "may be responsible for the billings that gave rise to this overpayment." Empire informed LIA that payment would be suspended "until such time as a final determination can be made" regarding the entity responsible for the overpayment. Empire advised LIA, "[Y]ou may submit a rebuttal statement as to why this suspension should be removed."

In a letter dated August 8, 1997, LIA submitted its rebuttal to the suspension, pursuant to 42 C.F.R. § 405.372(b)(2). The letter states that LIA purchased Gosline in November 1996 and applied to Empire for enrollment in the Medicare program on November 8, 1996. LIA claimed that it was not "in place to properly bill Medicare for ambulance transportation services" until approximately April 1, 1997 because (1) the Medicare provider number LIA received on January 28, 1997 was missing a digit; (2) LIA was not listed as a Participating Provider on January 28, 1997; (3) LIA could not bill Medicare until it received its Medicaid provider number, which it did not receive until March 21, 1997; and (4) LIA's Medicaid application would not be processed until Medicaid received LIA's Medicare provider number. LIA explained that it did not change its billing from Gosline to LIA until all of LIA's provider numbers were in "the system."

LIA also stated that "due to cash flow constraints as well as for the continuation of business, we maintained the status quo until we could properly bill all governmental agencies for ambulance services rendered under [LIA]." LIA said that it believed this practice was acceptable because the New York DOH allows a "winding down" period of 3–4 months for companies to change the logos on ambulances and uniforms. LIA further asserted that if it had waited to bill Medicare "while the administrative agencies processed our various applications ... [it would have] bankrupt [the] company before it could even commence business operations." LIA admitted that it was "the responsible party for any billing activity performed by Gosline Ambulance after [its] purchase" of Gosline. In closing, LIA expressed its "hope that this correspondence demonstrates our sincere belief and good faith that our only purpose was to continue the business aspects of our ambulance purchase while adhering to all rules, requests and requirements by Medicare/Medicaid in processing our application for a provider number."

In a letter dated August 22, 1997, Empire decided not to lift the suspension be-

cause, although LIA's rebuttal "letter attempts to explain the reasons for improper billing, [Empire was] not persuaded that fraud or misrepresentation [wa]s not involved in [LIA's] billing practices." Empire attempted to refute all of LIA's rebuttal assertions by arguing that: (1) LIA could bill Medicare as of January 28, 1997, the date on which LIA's Medicare provider number was approved; (2) LIA could bill Medicare even though LIA was not initially listed as a Participating Provider; (3) LIA did not have to wait until it received a Medicare provider number before submitting its application to Medicaid; (4) LIA submitted its Medicaid application on January 20, 1997, thus demonstrating that LIA knew its Medicare provider number as of that date; (5) the fact that LIA did not receive its Medicaid provider number until March 21, 1997 did not prevent LIA from billing Medicare for services rendered to Medicare beneficiaries; (6) after the DOH decertified Gosline as to providing ambulance service, Gosline's provider number became invalid; (7) LIA's assertion that its billing practice was acceptable contradicts its signed Medicare application in which Daniel Roberts certified, "I understand that only the Medicare billing number for the supplier/provider who performed the service may be used when billing Medicare services"; and (8) Medicare approved LIA's application for a provider number in a timely fashion and, therefore, LIA's business was not interrupted.

Following a request by LIA's attorney regarding the suspension of payments, Empire, in a letter dated August 29, 1997, stated that "it appears that LIA billed for ambulance services when it was not, in fact, certified or authorized to render such services.... LIA was not authorized to render ambulance services until it was issued an ambulance service certificate by the ... [DOH]." In a letter dated September 24, 1997, the DOH informed CMS that LIA was authorized to render ambulance services at all relevant times. Based on this information from the DOH, LIA against requested clarification as to why its Medicare payments had been suspended. In response to this request, HHS explained that DOH's confirmation of ambulance authority addressed only one of the issues upon which the decision to suspend payments was based. HHS reiterated that, "[t]his action is being taken because of reliable evidence that payments you have received, either directly or through other entities that you have acquired or have control of, are the result of fraud or misrepresentation."

LIA did not receive any additional information regarding the "fraud or misrepresentation" nor did it receive a request to explain, confront or challenge those allegations.

On January 28, 1998, the OIG requested a 180–day extension of the suspension against LIA pursuant to 42 C.F.R. § 4-5.372(d)(1). In a letter dated February 6, 1998, CMS informed LIA that it had granted the OIG's request for an extension to complete its investigation, and that it had instructed Empire to continue withholding payment to LIA for an additional 180 days.

By letter dated July 23, 1998, the United States Attorney for the Eastern District of New York (the "U.S. Attorney") submitted a proposed settlement agreement to the Roberts, which the Roberts rejected. In a letter dated August 3, 1998, CMS informed LIA that it had granted a request by the U.S. Attorney for a 120–day extension of the suspension of Medicare payments to LIA. CMS informed LIA that it had instructed Empire to continue withholding payment to LIA for an additional 120 days.

On December 10, 1998, CMS informed LIA that it had granted a request by the U.S. Attorney for an additional 180–day extension of the suspension of Medicare

payments to LIA. On February 26, 1999, the U.S. Attorney submitted a second proposed settlement to LIA, which the Roberts also rejected. In a letter dated May 28, 1999, CMS informed LIA that it had granted a request by the U.S. Attorney to extend the suspension of Medicare payments "until the conclusion of a civil investigation and action."

No civil or criminal actions were commenced against LIA. Except for the letter dated August 4, 1997, HHS, CMS, and Empire never issued a formal finding that LIA had engaged in fraud or had made a misrepresentation. On March 16, 2000, the U.S. Attorney informed CMS that it was no longer requesting the continuation of the suspension against LIA.

### E. The Application of the Suspended Funds

In a letter dated April 20, 2000, and entitled, "Application of Suspended Monies to Final Overpayment Determinations," Empire explained that since August 4, 1997, it had suspended payments in the amount of $680,669.83, and was currently holding that sum for LIA. Empire stated that the suspended funds would be applied against an overpayment in the amount of $86,023.63 because it had been determined that Gosline or LIA had billed Medicare for services actually rendered by County Ambulance Service, another ambulance agency of which Daniel Roberts was an officer. Empire later reduced the amount of this overpayment because it improperly included funds Medicare had recovered by way of the Gosline overpayment. LIA is pursuing its administrative remedies regarding this overpayment, which is not at issue in the present case.

Empire's April 20, 2000 letter further explains that the suspended funds would also be applied to recover the Gosline overpayment of $545,702.23, which remained following the dismissal of Gosline's

appeal. However, Empire would add the amount of $5,898.04 from the amount of the overpayment to account for "interest that would have accrued had the suspended funds been applied when the checks were issued." Therefore, Empire advised LIA that it would issue to LIA a check in the amount of $43,233.55 within 30 days. Empire informed LIA that it could request a fair hearing regarding the $86,023.63 overpayment but advised LIA, "Please be aware that your appeal rights do not extend to review of the individual claim determinations involved in the Gosline overpayment since you have already been afforded due process and an overpayment has been determined by the Hearing Officer."

### F. LIA's Present Claims

The plaintiffs do not assert their specific claims with precision but, rather, leave the defendants and the Court to decipher the particular claims they raise. The Court has examined the complaint and finds that the plaintiffs alleged that the defendant: (1) violated their right to due process by suspending payments to them without notice and without allowing them an opportunity to dispute the suspension; and (2) violated their right to due process by retaining the suspended funds and applying them to the Gosline overpayment. The plaintiffs seek a writ of mandamus directing HHS to (1) commence a criminal or civil action against LIA; or (2) return the suspended funds to LIA.

The plaintiffs predicate federal subject matter jurisdiction on 28 U.S.C. § 1361, which provides the Court with "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the of the United States or any agency thereof to perform a duty owed to the plaintiff." Although the plaintiffs do not specifically assert federal question sub-

ject matter jurisdiction under 28 U.S.C. § 1331, the Court finds that such a basis for jurisdiction is implicitly alleged in the complaint because the two substantive claims assert due process violations.

### G. The Motion to Dismiss the Complaint

HHS moves to dismiss the complaint on the ground that the Court lacks the subject matter jurisdiction to entertain it. In particular, HHS contends that: (1) the plaintiffs have not exhausted their administrative remedies because Gosline and the Roberts withdrew their appeal from the Medicare Hearing Officer's determination that an overpayment in the amount of $545,702.23 had been made to Gosline; (2) when the plaintiffs withdrew their appeal regarding the Gosline overpayment, they abandoned any constitutional challenges; (3) the plaintiffs have not exhausted their administrative remedies in regard to the LIA overpayment; and (4) mandamus jurisdiction is unavailable. HHS also asserts that the Roberts lack the standing to assert claims in their individual capacities as "assignees of interest" of LIA.

### II. *DISCUSSION*

Based on a review of the complaint and the defendant's motion, the Court defines the question before it as follows: whether the Court has subject matter jurisdiction under either 28 U.S.C. § 1331 or 28 U.S.C. § 1361 over the plaintiffs' claims that (1) the decision by HHS to suspend Medicare payments to LIA deprived the plaintiffs of due process; and (2) the decision by HHS to retain and apply a portion of the suspended funds to the Gosline overpayment deprived the plaintiffs of due process.

As noted above, when considering a motion to dismiss the complaint, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction the Court may consider affidavits and other materials beyond the plead-

ings to resolve the jurisdictional question. *See Robinson v. Government of Malaysia,* 269 F.3d 133, 141–42 (2d Cir.2001); *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). Hearsay statements in affidavits may not be considered. *See Kamen v. AT & T,* 791 F.2d 1006, 1011 (2d Cir. 1986). Under Rule 12(b)(1), the Court must accept as true all material factual allegations in the complaint. *See Shipping Financial Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). However, because "jurisdiction must be shown affirmatively," the Court will not draw from the pleadings inferences favorable to the party asserting it. *Id.* Rather, the plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *See Makarova,* 201 F.3d at 113 (citing *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996)).

### A. Federal Question Subject Matter Jurisdiction

The Medicare Act limits judicial review of the Secretary's decisions to the methods provided in 42 U.S.C. § 405(h), which, although part of the Social Security Act, is incorporated into the Medicare Act by 42 U.S.C. § 1395ii. Section 405(h) provides that no action may be brought under 28 U.S.C. §§ 1331 and 1346 to recover on any claim "arising under" this subchapter and "[n]o findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except" as provided in 42 U.S.C. § 405(g). Section 405(g) provides for judicial review "after any final decision of the Secretary made after a hearing."

Claims "arise under" the Social Security Act if they are "inextricably intertwined" with benefit determinations under the Medicare Act. *See Heckler v. Ringer,* 466 U.S. 602, 622–24, 104 S.Ct. 2013, 2025–27, 80 L.Ed.2d 622 (1984); *Clarinda Home*

*Health v. Shalala,* 100 F.3d 526, 529 (8th Cir.1996). Therefore, where a Medicare provider's constitutional claim is "at bottom" a claim that he should have been paid for services, the claim is "inextricably intertwined" with a claim for benefits, and judicial review is governed by 42 U.S.C. §§ 405(g), (h). *See Ringer,* 466 U.S. at 614, 104 S.Ct. at 2021; *Clarinda,* 100 F.3d at 529. Further, the Supreme Court has indicated that the "arising under" language of Section 405(h) should be broadly construed. *See Weinberger v. Salfi,* 422 U.S. 749, 760–62, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

Here, the complaint alleges that two agency decisions deprived the plaintiffs of their constitutional right to due process. Despite the language in which the plaintiffs' claims are couched, the claims are "at bottom" attempts to recover the sum of $545,702.23 which the defendant suspended and applied to an overpayment. *See Ringer,* 466 U.S. at 614, 104 S.Ct. at 2021. "To contend that such an action does not arise under the Act whose benefits are sought is to ignore both the language and substance of the complaint." *Salfi,* 422 U.S. at 769, 95 S.Ct. 2457, 45 L.Ed.2d 522. Accordingly, the Court finds that the plaintiffs' due process claims arise under the Social Security Act, and therefore, judicial review of their claims can only be had after the Secretary has made a "final decision." 42 U.S.C. § 405(g).

The "final decision" requirement has two elements, one which is waivable and one which is non-waivable. *See Mathews v. Eldridge,* 424 U.S. 319, 327, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976); *Abbey v. Sullivan,* 978 F.2d 37, 43 (2d Cir.1992). "The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The non-waivable element is the requirement that a claim for benefits shall have been presented to the Secretary." *Eldridge,* 424 U.S. at 327, 96 S.Ct. at 899; *Abbey,* 978 F.2d at 43. There is no dispute that the plaintiffs have satisfied the presentation requirement. Therefore, the question before the Court is whether the plaintiffs have exhausted their administrative remedies in regard to each of their claims.

■ The first agency action at issue in this case is the decision to suspend Medicare payments to LIA. According to the Medicare regulations, such a decision is not a final agency decision. *See* 42 C.F.R. § 405.375(b). As such, this Court does not have subject matter jurisdiction to hear the plaintiffs' challenge to the decision. *See* 42 U.S.C. §§ 405(g)(h). The courts that have addressed this issue have also held that "a temporary withholding of payments pursuant to 42 C.F.R. § 405.371(b) is not a final determination which would trigger federal district court jurisdiction under 42 U.S.C. § 405(g)." *Diagnostic Cardioline Monitoring of New York, Inc. v. Shalala,* Civ. No. 99–5686, 2000 WL 1132273 *4 (E.D.N.Y. June 26, 2000); *see Clarinda Home Health v. Shalala,* 100 F.3d 526, 530–31 (8th Cir.1996) (holding that a temporary suspension of Medicare payments during an ongoing fraud investigation is not a final determination that can be reviewed by a federal district court); *Homewood Professional Care Center, Ltd. v. Heckler,* 764 F.2d 1242, 1249 (7th Cir. 1985); *Life Source Enterprises, Inc. v. Shalala,* Civ. No. 00–902, 2000 WL 33348793 (W.D.Tex. Nov.9, 2000); *Midwest Family Clinic, Inc. v. Shalala,* 998 F.Supp. 763, 767 (E.D.Mich.1998); *Neurological Assocs. v. Bowen,* 658 F.Supp. 468, 471 (S.D.Fla.1987). Indeed, a suspension of Medicare payments is "nothing more than a temporary measure necessary to maintain the status quo while the necessary facts are gathered and evaluated." *Clarinda,* 100 F.3d at 530; *see* 42 C.F.R. § 405.372(c), (e). In the present case, the

suspension of Medicare payments to LIA is not a final determination of the Secretary and, therefore, LIA has not met the exhaustion requirement.

Notably, the provider is not without a remedy regarding his suspended funds. *See Clarinda*, 100 F.3d at 529; *Life Source*, 2000 WL 33348793 * 4 ("The suspension ... may culminate in an appealable determination under § 405(h) if the claims are subsequently denied."). If the investigation conducted during the suspension of payments reveals that an overpayment has been made, the carrier or CMS informs the provider that he has determined the existence of an overpayment. *See* 42 C.F.R. § 405.372(c). Following the overpayment determination, the provider may request a fair hearing before the carrier, 42 C.F.R. §§ 405.815, 405.821; a fair hearing before the ALJ, 42 C.F.R. §§ 405.815, 405.855; and a review of the ALJ's decision by the HHS Departmental Appeals Board ("DAB"), 42 C.F.R. §§ 405.815, 405.856. Following the DAB's decision, the provider may obtain judicial review of the overpayment determination by filing a civil action in federal court. 42 C.F.R. § 405.857. Therefore, the plaintiffs could have their day in court if they pursue these administrative remedies in regard to the Secretary's final overpayment determination. *See Clarinda*, 100 F.3d at 529; *Life Source*, 2000 WL 33348793 *6. However, since the plaintiffs' first claim challenges the decision to suspend payments, and that decision is not a final determination, the Court lacks the subject matter jurisdiction to entertain the claim.

The second agency action at issue is the decision by the Secretary to apply the funds suspended from LIA to the Gosline overpayment. The defendant argues that the plaintiffs have not exhausted their administrative remedies in regard to this claim because withdrew their appeal to an ALJ from the hearing officer's decision.

The plaintiffs claim that they have exhausted their administrative remedies because LIA was not a party to the administrative proceedings regarding the Gosline overpayment; LIA was never named as a "responsible successor"; and nothing in the hearing officer's decision indicates that LIA is liable for Gosline's overpayment. In the Court's view, the least confusing manner of addressing the intertwined issues raised by these arguments is first to determine the actual identity of the provider in the Gosline administrative proceedings. If the identity of that provider is LIA, then the Court will address whether LIA has exhausted its administrative remedies.

The Court finds that based on the evidence submitted by both parties, Gosline was not the entity that challenged the overpayment determination because it ceased to exist as an independent company following the purchase of its assets by LIA in November 1996. The Asset Purchase Agreement provides for LIA's purchase of all Gosline's assets and licenses, but does not specifically provide for the purchase of Gosline's name or goodwill. Indeed, Gosline was the name of a company owned and operated by Diane Annunziata, Susan Cappello, and Vincenza Libasci, not by the Roberts. The Asset Purchase Agreement also provides, "The intent of this transaction is to form a new ambulance service known as Long Island Ambulance, Inc., which will operate in place of Gosline Ambulance, Inc.... The end effect will be elimination of Gosline Ambulance Service, Inc. as a DOH licensed ambulance service and [the creation of] a new ambulance service—Long Island Ambulance, Inc." Clearly, LIA, the Roberts, and the former owners of Gosline did not intend Gosline to exist as a company independent of LIA following LIA's purchase of its assets and operating authority.

The fact that as of December 5, 1996, Gosline was no longer authorized to provide ambulance service in New York State further demonstrates that Gosline ceased to exist as a separate entity following LIA's purchase of its assets. When Gosline transferred its operating authority to LIA on December 5, 1996, Gosline was no longer authorized to provide ambulance service in New York state. Thereafter, the Roberts submitted an application to the DOH for a new ambulance service certificate in LIA's name only. On January 9, 1997, LIA received its own ambulance service certificate. Had the Roberts intended to operate two separate ambulance companies, they would have retained Gosline's operating authority and obtained separate ambulance service certificates for Gosline and LIA. Similarly, the Roberts did not apply for a Medicare provide number in Gosline's name but, rather, only in LIA's name. The fact that the Roberts did not follow this course and the fact that that Gosline was not authorized to operate ambulances in New York after December 5, 1996 shows that Gosline ceased to exist after its assets were purchased by LIA.

Lastly, in his rebuttal letter to Empire, dated August 8, 1997, Daniel Roberts in essence states that Gosline did not exist as an independent entity following LIA's purchase of its assets. He argues that Empire should lift the suspension because LIA provided the services for which claims were submitted and only used Gosline's provider number because it had not yet been issued one. In addition, the letter describes a 3 to 4 month "winding down" period during which the Roberts were changing the business name on the ambulances and acquiring new uniforms and company logos. Daniel Roberts also refers to completing the "billing changeover from Gosline Ambulance to Long Island Ambulance." In addition, the Roberts state that following LIA's purchase of Gosline's assets, LIA "had complete control of all vehicles and assets belonging to Gosline" including Gosline's Medicare provider number. The Roberts also admitted that LIA was the party responsible for any billing performed by Gosline following LIA's purchase of Gosline's assets. Further, the letter states that ambulance services were provided "properly and in strict accordance with all Medicare requirements", and that the services were rendered by LIA. Nowhere in the letter does Daniel Roberts indicate that the Roberts were operating two separate companies. To the contrary, his assertion that the suspension of payments to LIA should be lifted is entirely based on the fact that Gosline no longer existed following the purchase of its assets by LIA.

Based on the foregoing, the Court finds that Gosline did not exist as a separate entity following the purchase of its assets by LIA. Therefore, Gosline, as an entity independent of LIA, could not challenge Empire's overpayment determination. Not only was LIA the sole entity existing that could have challenged the overpayment determination, it also was the logical entity to do so. As the Roberts indicate in their August 8, 1997 rebuttal letter, LIA performed the services that were the subject of the overpayment determination. In addition, although the Roberts do not specifically admit that LIA submitted the claims to Empire, LIA is the only entity that could have done so. Gosline was defunct, its owners were out of the picture, and LIA had purchased its assets including its Medicare provider number.

Further, LIA received the money Empire determined was an overpayment. Again, neither LIA nor the Roberts specifically admit to having received the money. However, in LIA's rebuttal letter, Daniel Roberts states that LIA believed that its billing practice was acceptable; that LIA had acted under a misapprehension; and

that LIA needed the Medicare payments to survive during the first few months of business. As such, with reasonable certainty, LIA received the money Empire determined was an overpayment. Thus, the Court finds that LIA was the only and logical company to challenge the "Gosline" overpayment.

That LIA challenged the "Gosline" overpayment is further demonstrated by the fact that the Roberts, LIA's sole shareholders, were the people who appeared during the administrative proceedings. In a letter dated December 2, 1997, the Roberts, acting as attorneys for "Gosline", requested a fair hearing regarding the Gosline overpayment. Both Roberts appeared at the fair hearing. In addition, the letters appealing the hearing officer's decision and withdrawing that appeal were signed by Jeffrey Roberts, as attorney for "Gosline". Although the Roberts stated that they were appearing on behalf of Gosline, that company was defunct. With reasonable certainty, the Roberts were using the name "Gosline" because Empire had referred to the overpayment as the "Gosline" overpayment for the reasons described above. Accordingly, the fact that the Roberts were the people who challenged the overpayment determination provides additional support for the conclusion that LIA was the actual provider in the "Gosline" administrative proceedings.

In sum, the Court finds that LIA was the entity that challenged what is referred to as the "Gosline" overpayment because (1) Gosline did not exist as an independent company following LIA's purchase of its assets in November 1996; (2) LIA was the logical company to challenge the overpayment determination; and (3) the Roberts who, while acting through LIA, purchased Gosline, were the people who challenged the overpayment determination. The Court notes that the parties use of the word "Gosline" in reference to the over-

payment determination and subsequent administrative procedures is inaccurate and misleading. However, because the claims for payment were submitted with Gosline's provider number, Empire was presumably required to cut a check to "Gosline". Accordingly, in a heavily-regulated bureaucratic structure such as Medicare, Empire was constrained to find that "Gosline" received an overpayment. Thereafter, the only clear way for LIA and the Roberts to refer to the overpayment was by describing it as the "Gosline" overpayment. Nevertheless, based on the foregoing, the Court finds that the use of the word "Gosline" in connection with the overpayment determination and subsequent administrative proceedings is descriptive only and bears no relation to the substance of the proceedings or the parties involved in them.

The next question the Court must answer is whether the plaintiffs have exhausted their administrative remedies in regard to their assertion that the Secretary violated their right to due process by applying LIA's suspended funds to Gosline's overpayment. Initially, the Court finds that LIA's claim is actually a challenge to the "Gosline" overpayment determination. The sum of money LIA seeks is identical to the amount of the Gosline overpayment. Moreover, the Medicare regulations provide that suspended payment are first applied "to reduce or eliminate an overpayment ... and then applied to reduce any other obligation to CMS or HHS." 42 C.F.R. § 405.373(e). Here, CMS applied the suspended funds first to an overpayment that it determined had been made to LIA. As mentioned in the Background section of this decision, that overpayment is not at issue in this case. Then, CMS applied the suspended funds to reduce LIA's other obligation to CMS, which it termed, "the Gosline overpayment." The regulations do not provide for

an appeal from the disposition of suspended payments because the a provider's recourse is to challenge the overpayment determination, which process occurs before the suspended funds are applied. *See generally*, 42 C.F.R. §§ 405.371, 405.372. Therefore, the Court finds that LIA's claim that the Secretary improperly applied the suspended funds to the "Gosline" overpayment is actually an attack on that overpayment, and the Court must determine whether LIA has exhausted its administrative remedies in regard to that claim.

A provider who disagrees with an overpayment determination may request a fair hearing before the carrier if the amount in controversy is $100 or more. 42 C.F.R. §§ 405.815, 405.821. If the provider is dissatisfied with the carrier hearing officer's decision, he may request a hearing before an ALJ if the amount remaining in controversy is $500 or more. 42 C.F.R. §§ 405.815, 405.855. The provider may then request review of the ALJ's decision by appealing to the HHS DAB, provided that the amount in controversy is $1,000 or more. 42 C.F.R. §§ 405.815, 405.856 (incorporating 20 C.F.R. § 404.967). A party to a DAB decision, or an ALJ decision if the DAB does not review the ALJ's decision, may obtain a court review by filing a civil action in a district court of the United States. *See* 42 C.F.R. § 405.857.

 LIA requested a fair hearing before the carrier and appealed the hearing officer's determination in accordance with 42 C.F.R. §§ 405.821, 405.855. However, LIA withdrew its appeal to the ALJ and sought no further review. Because LIA withdrew its request for a hearing before the ALJ and failed to obtain a decision from the HHS DAB, LIA has not obtained a final decision to be reviewed by this Court. *See* 42 C.F.R. § 405.855, 405.856, 405.857. Accordingly, LIA has not exhausted its administrative remedies in re-

gard to its second claim, and this Court lacks the federal question subject matter jurisdiction necessary to review it. *Eldridge*, 424 U.S. at 327, 96 S.Ct. at 899; *Abbey*, 978 F.2d at 43.

 The plaintiffs have not asked this Court for judicial waiver of the exhaustion requirement. However, the Court may waive the exhaustion requirement, and the criteria governing the Court's decision are: (1) whether the claim is collateral to a demand for benefits; (2) whether exhaustion would be futile; and (3) whether the plaintiffs would suffer irreparable harm if required to exhaust their administrative remedies before obtaining relief. *See Abbey*, 978 F.2d at 44. A court cannot apply these factors mechanically but, instead, must "be guided by the policies underlying the exhaustion requirement." *Abbey*, 978 F.2d at 44 (quoting *City of New York*, 476 U.S. at 484, 106 S.Ct. at 2032). The Court is also reminded that exhaustion is the rule and waiver the exception. *Abbey*, 978 F.2d at 44.

The plaintiffs' claims are not collateral to a claim for benefits. Although their claims are framed in constitutional terms, the plaintiffs seek to recover the sum of money HHS determined was overpaid to Gosline. Such relief is unquestionably administrative in nature. As the plaintiffs have not argued for a waiver, the Court lacks any factual allegations regarding the alleged futility of exhaustion or irreparable harm that would be suffered by directing the plaintiffs to exhaust their administrative remedies. Moreover, based on the record before it, the Court cannot determine that exhaustion would be futile. In addition, the Court finds no showing of irreparable harm because there is no indication that the suspension of payments and application of suspended funds to the Gosline overpayment subjected the providers to deteriorating health. *See Abbey*, 978

F.2d at 46 (suggesting that subjecting claimants to deteriorating health would be a demonstration of irreparable harm). Thus, the Court concludes that judicial waiver of the exhaustion requirement is not appropriate in this case, and the Court lacks federal question subject matter jurisdiction to hear the plaintiffs' claims.

## B. Mandamus Jurisdiction

The plaintiffs argue that the Court has subject matter jurisdiction over this action under the mandamus statute, which provides a district court with "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "[I]t is settled in this and other circuits that, notwithstanding the sweeping language of section 405(h), mandamus jurisdiction is available under circumstances where the writ properly would issue." *City of New York v. Heckler*, 742 F.2d 729, 739 (2d Cir.1984). "A writ of mandamus will not issue unless (1) the plaintiffs have a right to have the act performed, (2) the defendant is under a clear nondiscretionary duty to perform the act requested, and (3) the plaintiff has exhausted all other avenues of relief." *Heckler*, 742 F.2d at 739.

This is not a case in which the writ would properly issue. The Court's holding that LIA has not exhausted its administrative remedies means that LIA's request for mandamus relief must fail because exhaustion is a prerequisite for a writ of mandamus. In addition, the plaintiffs do not argue that the Secretary's decisions to suspend payments to LIA and apply the suspended funds to the "Gosline" overpayment are non-discretionary. Nor has the Court's independent research revealed any law in support of such an argument. *See generally Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 73 (2d Cir.1998) (stat-

ing that the investigation of possible Medicare fraud is a discretionary function). Consequently, because LIA has not exhausted all of its administrative remedies and has not demonstrated that the defendant owes it a non-discretionary duty, mandamus relief is not available. As such, mandamus jurisdiction is unavailable. *See Heckler*, 742 F.2d at 739.

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the defendant's motion to dismiss this action pursuant to Rule 12(b)(1) on the ground that the Court lacks subject matter jurisdiction over the plaintiffs' claims is **GRANTED**, and the case is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**